**THE BOARD OF PUBLIC INSTRUCTION OF LAFAYETTE COUNTY, et al., v. STATE OF FLORIDA, ex rel., T. E. Taylor, et al.**

24 So. (2nd) 99                                     June Term, 1945
December 21, 1945                                        Division B

*Davis, Davis & McClure,* for appellants.
*David Lanier,* for appellees.

THOMAS, J.:

At the instance of certain "citizens, residents and tax-payers" in Special Tax School District number 3, 4, 5, 14, and 15 of Lafayette County, a peremptory writ of mandamus was issued commanding the Board of Public Instruction to appoint teachers and principals for certain schools in districts numbered 3, 5, 14, and 15 and to reopen said schools for the year 1945-1946; also to repay to the funds of these four districts moneys theretofore transferred from them. This writ was rendered 25 August 1945; the alternative writ preceded it about three months. Parenthetically, as the history of the litigation develops it will be apparent why District 4, though

represented by two of the parties instituting the suit, was not mentioned in the final judgment.

The chronicle of events leading eventually to the order to activate the schools of the four districts and to reimburse their funds to the extent of moneys drawn from them will now be given.

From the preliminary writ it appears that in the year 1944 an election was held in all the districts we have described, except the one numbered 15, to determine whether they should be consolidated, and a majority of the voters registered a choice against the plan. The reason for reference to this election is, for the moment, rather vague, but will be explained in our comment following the summary of the evidence. The schools located at Riverside and Airline in districts numbered 3 and 5 were later closed and pupils who would normally have attended there were transported to a school in Mayo, the county seat, situated in District 4. The school at Antioch in District 14 was opened, but subsequently discontinued, and the pupils there were also transferred to "other districts." District 15 was not affected by the election; nevertheless its schools too were closed and the pupils sent elsewhere for instruction. It was recited that large sums of money had been transferred from the districts where no schools were maintained to "other county school funds outside [the] . . . districts." It was charged in the writ that the facilities of the Mayo schools had become over-burdened because of the attendance of students from Districts 3 and 5; and that its funds, part or all of which had been raised by a tax on property within the district, were being used to educate pupils from the other districts.

It was represented that the trustees in the respective districts had made no nominations of members of the instructional staffs to serve during the present term.

In reply to the allegations of the alternative writ the respondents denied that they had actually closed the schools of districts numbered 3 and 5, but explained that they had caused the pupils of those schools to be transferred to the schools in District 4 when it developed that teachers were not available in the former two districts for the year 1944-1945. They

averred that the school in District 14 (Antioch) had opened for the year 1944-1945, but during the term the principal became a member of the armed forces of the United States, and no competent successor could be found, whereupon it was agreed between the respondents and the trustees of that district that the eight pupils be taught at "other districts" in the county. They further answered that there were but six pupils in District 15 (Cook's Hammock), and because services of a teacher could not be procured these also were transferred elsewhere. The respondents admitted that there had been transfers of certain sums of money from districts numbered 3, 5, 14, and 15 to the general school fund. Their answer contained an itemized statement of the amounts paid from the general school fund for the transportation of pupils in the various districts and the amount transferred from the funds of the respective tax school districts to offset these expenses of conveyance. In three of the districts the transportation cost was more than the corresponding amounts transferred, and in the fourth, slightly less.

It will have been noted that there was much in the writ with reference to the failure of the school officials to maintain certain schools in the year 1944-1945, and, in the answer, about the difficulties, apparently insurmountable, of securing teachers.

It is but fair to repeat that it was specifically set out in the writ "that the Defendants [had] not appointed teachers and principals for said Districts 5, 3, 14 and 15 for the school year of *1945-1946*, tho the school year for *1944-1945* [had] long since closed." (Italics supplied.) This language was doubtless employed because of the provisions of the Florida School Code, Section 230.23, (7) (c), Florida Statutes, 1941, and F.S.A., for the appointment by the county board of members of the instructional staffs of special school districts where no nominations have been made by the trustees within certain periods computed from "the close of school" for the preceding term.

It is equally fair to emphasize the significant allegation of the answer that "respondents (had) caused diligent, but hitherto unsuccessful inquiry to be made for principals and

teachers for said schools for the year *1945-1946,* but [had] been unable to the present time to procure the services of qualified teachers and principals who [were] willing to teach in said schools." (Italics supplied.)

So far we have devoted our discussion to the situation appearing from the pleadings in the cause. We now resort to the record of the testimony taken before the judge in substantiation and elaboration of the position of the respondents. It should be said at the outset of the summary of the testimony that no witnesses whatever were introduced by the relators, either in chief or rebuttal, and we may assume, then, that the story as related by the witnesses for the respondents presents substantially the conditions prevailing in Lafayette County at relevant times preceding the issuance of the peremptory writ of mandamus.

The County Superintendent of Public Instruction and secretary of the board, during the year 1944, testified that no affirmative action had been taken to close the schools in District 3 (Riverside) and 5 (Airline), but that these schools were not opened because no teachers could be obtained. He testified that he was instructed by the board to make every effort to provide instructors, and then related the extent of his activities to that end. He communicated with the State Department of Education, which issues bulletins monthly containing the names of applicants for positions, and wherever possible he got in touch with these candidates. He also said that he got in touch with Gulf Teachers Agency, located in Gainesville, Florida, and often corresponded with Florida State College for Women. Some applications were received from Southern Teachers Agency, and many prospective teachers were reached by telephone. He related how he tried to get instructors from "as far as the New England states" and observed that it was "a matter of common knowledge that teachers [had] been very scarce during the past two or three years." This former official recounted that the school in District 3 (Riverside) was supposed to open; that he had employed a teacher for it whom the trustees had chosen, and a short time before she was to begin her duties she resigned and entered the employ of P. K. Younge Laboratory School at

Gainesville. A meeting was held with the patrons of the school, who were apprised of the difficulty being experienced in securing a teacher. Every effort was immediately made to provide one, but the situation grew hopeless, and the pupils were then transported to Mayo. Turning to the schools in Districts 14 and 15, the witness related that in the former (Antioch)—speaking with reference to the year 1944-1945— a teacher had been secured and had commenced his duties only to be selected for service in the armed forces, whereupon he gave ten days' notice of his leaving, and left. An effort was then made to ascertain whether the State Department of Education knew of any teachers whose services could be procured, but the answer was in the negative. A teacher was sought from Florida State College for Women without avail. Meanwhile no applications were made to the board for the position. He knew little about the activities with respect to securing a teacher for District 15, but he thought the trustees and the board had agreed to transport the children residing there to Mayo. When asked whether the efforts made on the part of the officials were restricted to any particular schools, he replied that their endeavors were to get teachers for all the schools in the county; that this instruction had been given to the supervisor and that she understood that teachers were needed in the entire county school system. On cross-examination he testified that it had been difficult for several years to obtain instructors because they disliked to teach in rural districts. This witness, who had served as county superintendent during the year 1944, was succeeded on the stand by the county superintendent who was in office at the time of the hearing in mid-1945 and had served in that capacity since the beginning of the calendar year.

The present superintendent said he had met regularly with the board since entering office, and that no official action had been taken by the board with reference to closing schools on Districts 3, 5, 14 and 15. No nominations of teachers had been made by the trustees of these districts for the school year 1945-1946, so he had been directed by the board to try to secure them. He said that he had attempted to employ instructors, but had met with no success. He reported that he

had corresponded with the "replacement bureau in Gaines-ville"; that the "State Department" sends out periodically lists of instructors and that he had been in touch with "every one that is on our list and also in Gainesville and other teach-ers that I could hear of I have contacted." All his efforts had been of no avail; nevertheless he was still doing everything possible to try to remedy the situation resulting from the lack of qualified instructors. No positive action had been taken by the Board of Public Instruction during his term toward clos-ing the schools of the four districts we have mentioned so often. It was this witness who testified as to the amounts which had been transferred from these districts to the general school fund. He was instructed by the board, so he testified on cross-examination, "to locate teachers anywhere [he] could find them," and in compliance he had been correspond-ing since the preceding May with teachers whose names ap-peared on the list issued by the State Department of Educa-tion. It was developed on the redirect examination of this witness that nine or ten more teachers were needed on the staff of the school in Mayo.

The next witness introduced by the respondents was the County School Supervisor who worked under the jurisdiction of the County Board of Public Instruction in the supervision of all schools in the county. Immediately prior to accepting this position she had worked in the office of the superintendent and had written numerous letters, sent some telegrams, and made a few telephone calls in an attempt to employ instructors both for the rural schools and those at the county seat. During the summer months of 1944 she communicated with the dean of Florida Southern College and a number of teachers on the campus in furtherance of the effort to find instructors. She told of the employment of a teacher for the Airline school, who had later resigned, and she swore that she had contacted several persons with a view to securing their services, was continuing her efforts at the supervisors' conference in Talla-hassee, then in session. On cross-examination this witness reiterated that she was instructed to locate any teachers who might be available for any of the rural schools, and report her progress to the superintendent.

This supervisor was followed to the witness stand by the Chairman of the Board of Public Instruction. He, too, said that no direct action had been taken to close the schools in the district in question; that no nominations or recommendations had been received from the trustees; that no teachers had been selected or appointed by the board except for the school in District 14 (Antioch). The service of this teacher, as we have seen, was terminated when he was selected for entrance into the armed forces. This witness stated positively that he had continually done everything he could to get in touch with any prospective school teachers, and he related instances to support his statement.

The cause for the respondents was concluded with the testimony of the other two members of the Board of Public Instruction, who substantiated the story related by the witnesses who preceded them.

We reiterate that the relators in this case introduced no witnesses; so the situation described by the ones for the respondents must be accepted as true. From this testimony and from the pleadings it is obvious to us that an abnormal condition existed because of the dearth of teachers. It was established that no express action was taken by the persons in charge of the school system to close the schools in the rural districts numbered 3, 5, 14, and 15, but that one closed, three were not opened, all were not maintained because teachers were not available to conduct classes.

Early in the trial it appears, from rulings on objections to certain evidence, that the court held the view that members of the board had acted in a personal rather than an official capacity because, as he commented, "they can only close schools or handle the public's affairs by official action of which they make a minute and place it in the records to show what they did and why they did it, and if this school closing as testified by Professor Medlock [the superintendent serving in 1944] was a makeshift arrangement whereby no official action at all on the part of the Board was taken, then certainly the three members who composed the Board had no right to personally close the schools, and the only way they could close

them legally, if at all, was by an official action made a part of their records by appropriate minutes."

As we construe the allegations of writ and answer, the issue was presented whether respondents closed the schools. No testimony was offered to show that they did. On the contrary, there is no refutation of the testimony establishing the defense that no such direct action was taken, but that failure to open schools in three districts and continue the school in the fourth resulted from a condition beyond the control of respondents and despite their efforts to remedy it. Since their defense was so completely established, the eventual question will be whether the discretionary writ should have issued commanding them to "reopen" the schools, notwithstanding their proof that they could not.

The veteran circuit judge held the view that the situation "stems out of the results of the consolidation election," but from our perusal of the uncontradicted statements of the very officials charged with the proper conduct of the schools—two superintendents, three board members, and the supervisor—we can detect no ulterior purpose to abolish the schools in the rural districts to which we have so often referred, or to thwart the will of the voters who had registered dissatisfaction with the plan of consolidation. We have found nothing in the record to indicate any but the best motives on the part of the two superintendents and the members of the board, as well as the supervisor; apparently they earnestly endeavored to comply with the law with reference to supplying these teachers. It is plain from their testimony that no nominations or recommendations were made by the trustees, and although it was the duty of the board under Chapter 230, Florida Statutes, 1941, and F.S.A., supra, to proceed to the organization of a staff for these Special Tax School Districts upon the failure of the trustees to act, there is an equally important obligation on the part of the board, and a fundamental one, to see that the children of school age are properly taught by worthy instructors.

We cannot resist remarking that, in the situation facing them, the course pursued by the Board of Public Instruction was entirely practical, even if technically irregular. If, as

was shown by undisputed testimony, no teachers could be obtained, or at least no competent ones, it was much better that the pupils be transported to schools in other districts than that their training be allowed to suffer for the period that the condition existed. We can but wonder what better the superintendent and the members of the Board of Public Instruction could have done. We wish expressly to state that this is an observation on practicality and not to be taken as a decision on the question whether money received from taxes in one district may be expended to instruct pupils from another district; nor as determining that funds from one district may be transferred to the general fund and used to discharge costs of transporting pupils from that district to another. Article XII, Section 10 of the Constitution. We do not feel obligated to pass on the constitutional question in this action in mandamus. We have considered this comment fitting because of the suggestion impugning the motives of respondents.

It is well established that mandamus is a discretionary writ which will not be granted except on a showing of a clear legal right of the relator to it, State ex rel. Brown v. Dewell, 131 Fla. 566, 179 So. 695; State ex rel. Palmer v. Gray, 92 Fla. 1123, 111 So. 242, or, to state it otherwise, it will not be allowed in cases of doubtful right, and will issue or not, depending upon the court's sound discretion, State ex rel. Davis v. Buckles, 147 Fla. 597, 3 So. (2nd) 170.

It will be recalled that the peremptory writ commanded the members of the Board of Public Instruction to appoint teachers and principals and reopen the schools for the year 1945-1946. It is shown by testimony, uncontradicted, that these respondents had done everything possible to procure the services of instructors, without success, and it is likewise obvious, also from the testimony, undisputed, that they had never actually closed the schools. They all testified that no such positive action was ever taken, and one of them, that no permanent plan was adopted.

In these circumstances we think that no clear legal right to the writ of mandamus was established. In so holding, we do not even intimate that the respondent Board of Public

Instruction can consolidate schools of the Special Tax School Districts with those in another district or that they can by positive action discontinue the schools in Special Tax School Districts and transport the pupils to other schools, Bronson et al. v. The Board of Public Instruction for the County of Osceola, 108 Fla. 1, 145 So. 833; Reaves et al. v. Sadler et al., 136 Fla. 553,189 So. 41; nor is what we have written to be construed as condoning the present practice of the Board of Public Instruction beyond that time when the services of competent teachers are unavailable; but we do say that in the exigency reflected in the pleadings and established beyond dispute, the relators have shown no clear legal right to a writ summarily commanding the Board of Public Instruction to employ teachers and reopen the schools when it is plain that three of the schools have not been opened in the first place and the fourth not continued because of fruitless, though strenuous, efforts on the part of the respondents to produce teachers.

Another reason for the conclusion that the judgment should be reversed is the apparently improper joinder of relators. There is an evident diversity between the interests of the relators resident in District 3, 5, 14, and 15 and those in District 4, and in discussing it we shall not pause to remark upon any complications that may have arisen by reason of the relator from District 15 having been dismissed from the action before its determination. We are not aware of a common interest shared by the relators from District 4 and those from the other districts. The former seek relief presumably on the tenuous ground that their school has become crowded by the instruction of the pupils from two of the other districts and that this situation will be relieved and their tax burden lightened if these guest-pupils are returned to their own districts. They certainly would not be benefited by the repayment from the general school fund, in which they and others in like situation in the county as a whole are interested, to the districts in which they are apparently not interested, of the moneys alleged to have been improperly transferred. Theoretically at least, coercion of that action would be to their disadvantage, as the general fund would be

decreased thereby. The second group would be benefited, so they claim, by the repayment of the funds of their respective districts of the amounts shown to have been transferred.

Even though we assume for the moment that the relators from the first four districts could properly join on the doubtful theory that they claim money and action from a common source, the Board of Public Instruction, we do not consider that such a position coincides with the one taken by relators from District 4, who are attempting primarily to rid the school in their district of the pupils from other districts and prevent further expenditure of the funds of their district for the training of the pupils from without.

The relators attempt to meet this challenge by citing 35 Am. Jur., Mandamus, Section 333; City of Clearwater v. State, 108 Fla. 623, 147 So. 459; Florida Cent. and P. R. Co. v. State, 31 Fla. 482, 13 So. 103; and Campbell v. State ex rel. Garrett, 124 Fla. 244, 168 So. 33: In the first of these it was held that although district rights of individual bond holders were asserted jointly, this would be approved where they sought imbursement from a common fund. Referring to the case of Florida Cent. & P. R. Co. v. State, supra, the court said the interests represented were not "separate and distinct, nor wholly public," as in that case, but that a "singleness of the duty . . . to pay interest . . . [gave] rise to a common and joint interest" to coerce the performance of a duty to discharge the debt. The rights of the holders of interest coupons were individual, but there was a common fund from which both should be paid.

In Campbell v. State ex rel. Garrett, supra, it was decided that two judgment creditors could join in forcing the levy of a single tax to pay judgments of a drainage district.

We gravely doubt that these cases would justify our holding that the rights of the relators from the four districts —that is, 3, 5, 14, and 15, are so nearly the same that they could be presented in one mandamus action: We can think of quite a dissimilarity between a situation where two bondholders ask levy of a single tax to retire their securities or seek payment of their bonds from a common fund and four relators seeking activation of schools in as many districts where

circumstances in any of them might differ entirely from the circumstances in any of the others. But we have no doubt that the rights of the relators from these four districts, even though somewhat resembling one another, are so different from the rights of the relators from District 4 that all may not be presented jointly.

We conclude that the motion to quash should have been granted in the first instance, and the writ denied in the second.

The judgment is reversed and the cause remanded for such proceedings as shall be consistent herewith.

Reversed.

CHAPMAN, C. J., BROWN and SEBRING, JJ., concur.